RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0247p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

LABORERS' LOCAL 265 PENSION FUND; PLUMBERS
and PIPEFITTERS LOCAL NO. 572 PENSION FUND,

    *Plaintiffs-Appellants*,

  *v.*

iSHARES TRUST et al.,

    *Defendants-Appellees*.

No. 13-6486

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:13-cv-00046—Aleta Arthur Trauger, District Judge.

Argued: July 30, 2014

Decided and Filed: September 30, 2014

Before: BOGGS, CLAY, and GILMAN, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** C. Mark Pickrell, THE PICKRELL LAW GROUP, P.C., Nashville, Tennessee, for Appellants. Seth M. Schwartz, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, New York, New York, for Appellees. **ON BRIEF:** C. Mark Pickrell, William G. Brown, THE PICKRELL LAW GROUP, P.C., Nashville, Tennessee, James G. Stranch, III, J. Gerard Stranch IV, Michael G. Stewart, Michael J. Wall, BRANSTETTER, STRANCH & JENNINGS, PLLC, Nashville, Tennessee, Jenny L. Dixon, ROBBINS ARROYO LLP, San Diego, California, for Appellants. Seth M. Schwartz, Jeremy A. Berman, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, New York, New York, John R. Jacobson, Milton S. McGee, III, RILEY WARNOCK & JACOBSON, PLC, Nashville, Tennessee, Bruce H. Schneider, STROOCK & STROOCK & LAVAN LLP, New York, New York, for Appellees.

---

# OPINION

---

RONALD LEE GILMAN, Circuit Judge.  An affiliate of the investment advisor for iShares mutual fund functions as a middleman between iShares and those who seek to borrow iShares's securities holdings, charging a fee of 35% for all net revenue received by iShares from such lending activity.  The plaintiff shareholders challenge this fee as excessive under the Investment Company Act of 1940 (ICA), 15 U.S.C. § 80a-1 *et seq*.  Their complaint was dismissed by the district court for failure to state a claim.  For the reasons set forth below, we **AFFIRM** the judgment of the district court.

### I.  BACKGROUND

**A.    Factual background**

Securities lending promotes market efficiency and liquidity by making securities readily available to a variety of borrowers, including short-sellers.  The Second Circuit has described the practice as follows:

> Securities lending is an important and significant business that describes the market practice whereby securities are temporarily transferred by one party (the lender) to another (the borrower).  The borrower is obliged to return the securities to the lender, either on demand, or at the end of any agreed term.  For the period of the loan the lender is secured by acceptable assets delivered by the borrower to the lender as collateral.  Typically, the collateral—which, in the United States, often takes the form of cash—is valued at 102% [to] 105% of the market value of the loaned securities.  The borrower of securities may be motivated by any number of factors, including the desire to cover a short position, to sell the borrowed securities in hopes of buying them back at a lower price before returning them to the lender, or to gain tax advantages associated with the temporary transfer of ownership of the securities.

*United States v. Zangari*, 677 F.3d 86, 88 (2d Cir. 2012) (internal citations, footnotes, and quotation marks omitted).

The plaintiffs in this case are two pension funds that are shareholders in exchange-traded funds issued by iShares, Inc. and iShares Trust (collectively iShares).  iShares, as part of its

mutual-fund operations, lends its securities holdings to various borrowers. This lending activity generates substantial revenue for iShares because borrowers must post cash collateral and pay interest on their loans. BlackRock, Inc., which is not named as a defendant, is the corporate parent of iShares. Defendant BlackRock Institutional Trust Company, N.A. (BTC), a wholly owned subsidiary of BlackRock, serves as iShares's lending agent. BTC functions as a middleman between iShares and those who seek to borrow iShares's securities holdings. In exchange for its services as lending agent, BTC receives 35% of all securities-lending net revenue. The parties refer to this percentage as the "lending fee."

Defendant BlackRock Fund Advisors (BFA) is a wholly owned subsidiary of BTC. BFA is the investment adviser for iShares and manages the funds' portfolios pursuant to an investment-advisory agreement. Under this agreement, BFA receives a separate fee that is not at issue in this case.

The plaintiffs allege, among other things, that BFA and BTC violated Section 36(a) and Section 36(b) of the ICA, 15 U.S.C. § 80a-35(a), (b), by charging an excessive lending fee. According to the plaintiffs, the fee charged by BTC bears no relationship to the actual services rendered.

**B.    Procedural background**

The plaintiffs filed suit in federal district court against BFA, BTC, individual iShares directors, and several nominal defendants in January 2013. In response, the defendants moved under Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the complaint for failure to state a claim. The district court granted the defendants' motion and dismissed the complaint in August 2013. Although the district court granted the plaintiffs leave to amend their complaint, the plaintiffs instead filed this appeal following the entry of a final judgment.

The plaintiffs do not object to the practice of securities lending in general, but they do object to the 35% lending fee that BTC charges. They specifically allege that:

> 66. BFA, acting as investment adviser to iShares and the Funds, has retained BTC, its parent company, to manage the lending of securities owned by iShares ETF's, including the Funds.

> . . .
>
> 70.  BTC's securities lending fees with respect to the Funds are set out in an Amended and Restated Securities Lending Agreement with iShares, Inc. and iShares Trust, among other entities. That agreement provides that BTC shall be provided a fee of 35% of the "net amount earned on securities lending activities." This 35% fee is, standing alone, disproportionally large and far higher than would be negotiated with all unaffiliated agent[s] in an arms length transaction.
>
> . . .
>
> 73.  These securities lending fees charged to iShares investors are disproportionately large—"about three times more than what is typical in the industry."

(Verif. Compl. ¶¶ 66, 70, 73)

The plaintiffs' verified complaint contains three counts. In the first count, the plaintiffs assert derivative claims under Section 36(b) of the ICA against BFA, BTC, and the individual iShares directors. They allege that BTC's 35% lending fee is excessive and bears no relationship to the actual services rendered.

In the second count, the plaintiffs assert a claim under Section 47(b) of the ICA. They allege that the contracts "obligating iShares or any Fund to pay BTC or BFA or affiliates fees arising out of securities lending transactions . . . were performed in violation of the [ICA] and are therefore unenforceable." The plaintiffs contend that the contracts were made in "violation of at least four provisions of the [ICA]—Sections 17(d), 17(e), 36(a) and 36(b)." They do not, however, appeal the district court's dismissal of this count.

In the third count, the plaintiffs assert a derivative claim under Section 36(a) of the ICA against BFA, BTC, and the individual iShares directors. They allege that the defendants breached their fiduciary duties to the shareholders by "using investor assets for the benefit of their hedge funds and short-selling operations, without compensating investors in line with compensation that would have been paid based on arm's length transactions."

In response, the defendants argued that (1) the Section 36(b) claim is barred by the terms of a 2002 exemption order issued by the Securities and Exchange Commission (SEC) to BlackRock's predecessor-in-interest in which the SEC permitted the securities-lending operations at issue here, and (2) Section 36(a) of the ICA does not provide an implied private

right of action. The district court, after agreeing with both of the defendants' arguments, dismissed the complaint for failure to state a claim. Although the dismissal was without prejudice, the plaintiffs chose not to amend their complaint. The district court then entered a final judgment against the plaintiffs in October 2013. This timely appeal followed.

## II. ANALYSIS

### A.     Standard of review

We review de novo a district court's decision to grant a motion to dismiss for failure to state a claim. *Lambert v. Hartman*, 517 F.3d 433, 438–39 (6th Cir. 2008). In reviewing the grant of such a motion, we construe the complaint in the light most favorable to the plaintiff and accept all factual allegations as true. *Id.* at 439. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

### B.     The district court did not err in dismissing the Section 36(b) claim

The plaintiffs first contend that the district court erred in dismissing their Section 36(b) claim against BFA. They frame the relevant issue on appeal as whether "Section 36(b) provides a remedy against the investment adviser, BFA, for excessive compensation paid to both it and its affiliate, BTC." The plaintiffs argue that Section 36(b) permits a lawsuit against an investment adviser for excessive compensation even where (as is the case here) the SEC has blessed the securities-lending operations of an affiliated lending agent (BTC).

Section 36(b) of the ICA provides as follows:

> For the purposes of this subsection, the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment adviser, or any affiliated person of such investment adviser, or any other person enumerated in subsection (a) of this section who has a fiduciary duty

concerning such compensation or payments, for breach of fiduciary duty in respect of such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person.

15 U.S.C. § 80a-35(b).

Closely related to Section 36(b) of the ICA is Section 17, which imposes broad restrictions on transactions between registered investment companies and their affiliates. *See id.* § 80a-17(a) (listing prohibited transactions); *see also id.* § 80a-17(d) (prohibiting certain joint transactions among affiliates). The defendants do not dispute that BFA and BTC are affiliates under the ICA. A subsection of Section 36(b), however, contains a carve-out provision, which states that "[t]his subsection shall not apply to compensation or payments made in connection with transactions subject to section 80a-17 of this title [i.e., Section 17 of the ICA], or rules, regulations, or orders thereunder." *Id.* § 80a-35(b)(4).

As relevant here, the SEC has the authority to issue exemption orders under the ICA. 15 U.S.C. § 80a-6(c). In 2002, BlackRock's predecessor-in-interest received such an order from the SEC. The exemption order permits iShares to "pay an affiliated lending agent, and the lending agent to accept, fees based on a share of the revenues generated from securities lending transactions and to lend portfolio securities to affiliated broker-dealers." In re Maxim Series Fund, Inc., Investment Company Act Release No. 25878, 2002 SEC LEXIS 3327 (Dec. 27, 2002).

In their briefs, the plaintiffs acknowledge the existence of the 2002 exemption order. They nevertheless contend that their Section 36(b) claim against BFA remains unaffected by the order because BTC's compensation as the lending agent should be imputed to BFA "for purposes of deciding whether BFA [breached] its fiduciary duty" as iShares's investment adviser. In essence, the plaintiffs' argument is that BTC's lending fee should be aggregated with BFA's separate investment-advisory fee in order to determine whether BFA violated its fiduciary duty by receiving excessive compensation.

The Second Circuit has rejected a similar argument regarding the aggregation of separate fees. In *Meyer v. Oppenheimer Management Corp.*, 895 F.2d 861 (2d Cir. 1990), an individual shareholder filed a derivative suit under the ICA against a money-market mutual fund and its

investment adviser, alleging that the adviser's fees and the distribution fees received by the adviser's affiliates were excessive. The plaintiff specifically argued that the adviser's fees and the distribution fees should be aggregated for the purpose of analyzing his Section 36(b) claim. In rejecting the plaintiff's aggregation argument, the *Meyer* court explained that

> Section 36(b) of the Act imposes a fiduciary duty on investment advisers and affiliated persons regarding the receipt of compensation for services, or of payments of a material nature. An advisory fee violates Section 36(b) if it is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining.
> . . . [W]e [have] stated that [a] claim that payments made under Rule 12b–1 [which permits the use of fund assets to compensate brokers for the brokers' sale and distribution-related expenses] are excessive when combined with advisory fees, where both payments are made to affiliated persons of an investment adviser, is cognizable under [S]ection 36(b). This statement stands only for the proposition that the costs of 12b–1 plans involving such affiliates as well as advisory fees are subject to review under Section 36(b). Were such review not available, investment advisers might be able to extract additional compensation for advisory services by excessive distributions under a 12b–1 plan. *The statement does not, however, stand for the additional proposition that 12b–1 payments to an adviser's affiliates are to be aggregated with advisory fees to determine the merits of a Section 36(b) claim.* The two kinds of payments are for entirely different services, namely advice on the one hand and sales and distribution on the other. If the fee for each service viewed separately is not excessive in relation to the service rendered, then the sum of the two is also permissible.

*Id.* at 866 (emphasis added) (internal citations and quotation marks omitted).

The logic of *Meyer* applies with equal force to the present case. BTC receives a fee of 35% in exchange for its services as lending agent. The allegations in the complaint focus on this lending fee. Nowhere in the complaint do the plaintiffs protest the separate fee that BFA receives pursuant to its investment-advisory agreement with iShares. The plaintiffs have therefore forfeited their aggregation argument. *See Owens Corning v. Nat'l Union Fire Ins. Co.*, 257 F.3d 484, 493 n.4 (6th Cir. 2001) (holding that allegations made for the first time on appeal are forfeited unless plain error exists). And even if the complaint had contained specific allegations protesting BFA's investment-advisory fee, that fee is altogether separate from the lending fee charged by BTC and thus provides no logical basis for aggregating the two. *See Meyer*, 895 F.2d at 866.

None of the plaintiffs' arguments to the contrary are persuasive.  First, the plaintiffs point to the legislative history of Section 36(b)(4) in support of their contention that BTC's lending-fee compensation should be aggregated with BFA's investment-advisory fee in determining whether BFA violated Section 36(b).  The plaintiffs then cite cases that have characterized certain portions of Section 36(b) as ambiguous, thereby making inquiry into the legislative history of Section 36(b) appropriate.  *See Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 345 (2010) (characterizing the phrase "fiduciary duty with respect to the receipt of compensation" as ambiguous); *Fogel v. Chesnutt*, 668 F.2d 100, 112 (2d Cir. 1981) (same).

But even if certain portions of Section 36(b) are ambiguous, this does not mean that the relevant carve-out provision in Section 36(b)(4) is ambiguous.  The carve-out provides that Section 36(b) "shall not apply to compensation or payments made in connection with transactions subject to section 80a-17 of this title, or rules, regulations, or orders thereunder." 15 U.S.C. § 80a-35(b)(4).  Because the SEC's 2002 exemption order authorizes transactions that would otherwise be prohibited by Section 17, the carve-out provision in Section 36(b)(4) is triggered and the plaintiffs' Section 36(b) claim must fail.  There is accordingly no need to examine the legislative history.  *See Roberts v. Hamer*, 655 F.3d 578, 583 (6th Cir. 2011) ("If the words are plain, they give meaning to the act, and it is neither the duty nor the privilege of the courts to enter speculative fields in search of a different meaning.") (internal quotation marks omitted).

In any event, the legislative history of Section 36(b)(4) is of little help to the plaintiffs.  They principally rely on then-SEC Chairman Hamer Budge's congressional-hearing testimony that "any amounts received from whatever source by an investment adviser, its affiliates and other persons . . . in transactions subject to section 17 or 22 could, of course, be taken into account in determining whether the advisory fees meet the standards of section 36(b)."  But the complaint is focused on BTC's lending fee, not on BFA's investment-advisory fee.  And, as explained above, these separate fees may not be aggregated in a single Section 36(b) claim.  The plaintiffs' reliance on former Chairman Budge's testimony also suffers from the fact that such testimony is typically accorded little weight.  *See Pub. Citizen v. Farm Credit Admin.*, 938 F.2d 290, 292 (D.C. Cir. 1991) (per curiam) (noting that the "testimony of witnesses before

congressional committees prior to passage of legislation is generally weak evidence of legislative intent").

Section 36(b)(3) of the ICA further undermines the plaintiffs' argument. That section provides in relevant part that "[n]o such action shall be brought or maintained against any person other than the recipient of such compensation or payments." 15 U.S.C. § 80a-35(b)(3). Because BFA is not the "recipient" of the 35% lending fee, the plain text of Section 36(b)(3) strongly suggests that no action may be brought against BFA on the basis of the fee charged by BTC.

Finally, the plaintiffs argue that the SEC has adopted their position that "compensation earned by an investment adviser or affiliate from securities lending . . . is governed by the fiduciary duty set out in Section 36(b) even where the SEC has permitted the securities lending operations in question." The plaintiffs cite in support a 1995 no-action letter in which the SEC's Division of Investment Management staff declined to recommend any enforcement action under Section 17 of the ICA against an investment company that wished to compensate its affiliate for services that the affiliate would provide in connection with a securities-lending program. *See* Norwest Bank Minn., N.A., SEC No-Action Letter, 1995 WL 329622 (May 25, 1995). In the letter, the SEC staff opined that "[S]ection 36(b) of the Investment Company Act expressly places a fiduciary duty on investment advisers with respect to any compensation paid to affiliated persons of the adviser." *Id.* at *4 n.14.

The Norwest no-action letter, however, is distinguishable because the investment company seeking nonenforcement assurances from the SEC staff in Norwest did not already possess an exemption order from the SEC expressly permitting the securities-lending operations. Nor was the carve-out provision of Section 36(b)(4) at issue in the Norwest no-action letter. *Compare id.* at *5 (providing nonenforcement assurances rather than an exemption order pursuant to Section 36(b)(4)), *with* In re Maxim Series Fund, Inc., Investment Company Act Release No. 25878, 2002 SEC LEXIS 3327, at *3 (Dec. 27, 2002) (granting the requested exemptions under Section 17 and approving the securities-lending operations).

And the SEC, contrary to the plaintiffs' representations at oral argument, retains in all instances the authority to enforce Section 36(b) and ensure compliance with its exemption orders. *See* 15 U.S.C. § 80a-35(b) (explaining that an "action may be brought under [Section

36(b)] by the Commission"); *id.* § 80a-41 (containing the general enforcement provision of the ICA that authorizes the SEC to investigate and bring actions to enjoin violations of the ICA). For all of these reasons, the district court did not err in dismissing the plaintiffs' Section 36(b) claim against BFA.

C.     **The district court did not err in dismissing the Section 36(a) claim**

We now turn to the issue of whether Section 36(a) of the ICA provides an implied private right of action. This is an issue of first impression in the Sixth Circuit. *See M.J. Whitman & Co., Inc. Pension Plan v. Am. Fin. Enters., Inc.*, 552 F. Supp. 17, 22 (S.D. Ohio 1982) (holding that no implied private right of action exists under Section 36(a) of the ICA), *aff'd on other grounds*, 725 F.2d 394 (6th Cir. 1984). Other circuits are split on this issue, although all circuits that have considered it in the wake of *Alexander v. Sandoval*, 532 U.S. 275 (2001), have held that an implied private right of action does not exist. *Compare Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 114 (2d Cir. 2007) (per curiam) (holding that Section 36(a) of the ICA does not provide an implied private right of action), *with Moses v. Burgin*, 445 F.2d 369, 373 (1st Cir. 1971) (holding that the pre-1970 version of Section 36 of the ICA provides an implied private right of action).

Section 36(a) reads as follows:

> *The Commission is authorized to bring an action in the proper district court of the United States*, or in the United States court of any territory or other place subject to the jurisdiction of the United States, alleging that a person who is, or at the time of the alleged misconduct was, serving or acting in one or more of the following capacities has engaged within five years of the commencement of the action or is about to engage in any act or practice constituting a breach of fiduciary duty involving personal misconduct in respect of any registered investment company for which such person so serves or acts, or at the time of the alleged misconduct, so served or acted—
>
> (1) as officer, director, member of any advisory board, investment adviser, or depositor; or
>
> (2) as principal underwriter, if such registered company is an open-end company, unit investment trust, or face-amount certificate company.
>
> If such allegations are established, the court may enjoin such persons from acting in any or all such capacities either permanently or temporarily and award such injunctive or other relief against such person as may be reasonable and

>  appropriate in the circumstances, having due regard to the protection of investors and to the effectuation of the policies declared in section 80a–1(b) of this title.

15 U.S.C. § 80a-35(a) (emphasis added).

The plaintiffs argue that the text and structure of the ICA, along with its legislative history, compel the conclusion that an implied private right of action exists under Section 36(a). But as the Sixth Circuit recently explained:

> A private right of action is the right of an individual to bring suit to remedy or prevent an injury that results from another party's actual or threatened violation of a legal requirement. The fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person. Private rights of action to enforce federal law must be created by Congress. Congress may create a private right of action expressly or by implication. The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy.
>
> . . . .
>
> . . . [T]he Supreme Court [has] set forth four factors for evaluating whether a statute implicitly creates a private right of action: (1) whether the plaintiff is one of the class for whose especial benefit the statute was enacted; (2) whether there is any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one; (3) whether it is consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff; and (4) whether the cause of action is one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law. The Court has since clarified that these factors are not entitled to equal weight. The central inquiry is whether Congress intended to create a private right of action. Unless this congressional intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist.
>
> . . . The question [of] whether Congress intended to create a private right of action [is] definitively answered in the negative where a statute by its terms grants no private rights to any identifiable class. For a statute to create such private rights, its text must be phrased in terms of the persons benefited. Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons.

*Mik v. Fed. Home Loan Mortg. Corp.*, 743 F.3d 149, 158–59 (6th Cir. 2014) (internal citations and quotation marks omitted) (some alterations omitted).

The threshold question is thus whether the text or the structure of the ICA indicates an intent by Congress to create an implied private right of action under Section 36(a). Starting with the first sentence of Section 36(a) ("The Commission is authorized to bring an action . . . ."), we believe that the presumptive answer is "No." This conclusion is bolstered by the language in Section 42 that "empower[s] the Securities and Exchange Commission to enforce all ICA provisions." *Santomenno ex rel. John Hancock Trust v. John Hancock Life Ins. Co.*, 677 F.3d 178, 186 (3d Cir. 2012) (citing 15 U.S.C. § 80a-41).

The Supreme Court, moreover, has explained that the "express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001). This principle is fully applicable to the ICA, which was amended in 1970 to add Section 36(b)'s private right of action. *See* 15 U.S.C. § 80a-35. The creation of an express private right of action in Section 36(b) strongly implies the absence of such a right in Section 36(a). *See Touche Ross & Co. v. Redington*, 442 U.S. 560, 572 (1979) ("Obviously, then, when Congress wished to provide a private damage remedy, it knew how to do so and did so expressly."); *see also Olmsted v. Pruco Life Ins. Co. of N.J.*, 283 F.3d 429, 433 (2d Cir. 2002) ("Congress's explicit provision of a private right of action to enforce one section of a statute suggests that omission of an explicit private right to enforce other sections was intentional.").

Nor does the text of Section 36(a) contain any rights-creating language. It instead focuses on the "person[s] regulated rather than the individuals protected." *See Sandoval*, 532 U.S. at 289; *see also Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 116 (2d Cir. 2007) (per curiam) (noting the absence of any rights-creating language in Section 36(a) of the ICA). In sum, neither the text nor the structure of the ICA demonstrates an intent by Congress to provide an implied private right of action under Section 36(a).

We find the plaintiffs' arguments to the contrary unpersuasive. First, although the plaintiffs invoke the broad remedial purposes of the ICA, generalized references to the remedial purposes must yield to the unambiguous text and structure of a statute. *See Touche Ross & Co.*, 442 U.S. at 578 (explaining that even if a statute was enacted with a broad remedial purpose, this fact "will not justify reading a provision 'more broadly than [the statute's] language and the

statutory scheme reasonably permit'"). The plaintiffs also point to the legislative history surrounding the 1970 and 1980 amendments to the ICA, but the legislative history of a statute is irrelevant where "neither the text nor the statutory structure indicate that Congress intended to provide a private right of action." *Mik*, 743 F.3d at 160; *see also Bellikoff*, 481 F.3d at 117 (declining to accord weight to the legislative history of the ICA and explaining that the "analysis ends . . . because the text and the structure of the ICA reveal no ambiguity about Congress's intention to preclude private rights of action"); *Olmsted*, 283 F.3d at 435 ("Where the text of a statute is unambiguous, judicial inquiry is complete . . . .") (internal quotation marks omitted).

Finally, even if we were to consider the legislative history of the 1970 and 1980 amendments to the ICA, this would not save the plaintiffs' argument. For starters, the 1970 amendments to the ICA created an express private right of action under Section 36(b), which counsels against finding an implied private right of action in Section 36(a). The 1980 amendments to the ICA, moreover, dealt with business-development companies and had nothing to do with private rights of action. *See Bancroft Convertible Fund, Inc. v. Zico Inv. Holdings Inc.*, 825 F.2d 731, 735 (3d Cir. 1987) (discussing the 1980 amendments to the ICA). Furthermore, the post-enactment legislative history relied upon by the plaintiffs has little probative value because a post-enactment legislative body has no special insight regarding the intent of a past legislative body. *See Penn. Med. Soc. v. Snider*, 29 F.3d 886, 898 (3d Cir. 1994) ("Post-enactment legislative history is not a reliable source for guidance."); *Cont'l Can Co. v. Chicago Truck Drivers, Helpers & Warehouse Workers Union (Ind.) Pension Fund*, 916 F.2d 1154, 1157 (7th Cir. 1990) (observing that "'subsequent legislative history' [is] an oxymoron" and that "the legislative history of a bill is valuable only to the extent it shows genesis and evolution").

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.