COA Case No. 13-6486

---

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Laborers' Local 265 Pension Fund and
Plumbers and Pipefitters Local No. 572 Pension Fund,
*Plaintiffs-Appellants*,

v.

iShares Trust, *et al*.,
*Defendants-Appellees.*

_____

BRIEF OF APPELLANTS
_____

On Appeal from the United States District Court
for the Middle District of Tennessee
Case No. 3:13-cv-00046

**BRANSTETTER, STRANCH**
**& JENNINGS, PLLC**
James G. Stranch, III
J. Gerard Stranch IV
Michael G. Stewart
Michael J. Wall
227 Second Avenue North
Nashville, TN 37201
Tel: (615) 254-8801

**THE PICKRELL LAW GROUP,**
**P.C.**
C. Mark Pickrell
William G. Brown
Andrew E. Hill
5701 Old Harding Pike
Suite 200
Nashville, TN 37205
Tel: (615) 352-9588

**ROBBINS ARROYO LLP**
Brian J. Robbins
Craig W. Smith
Jenny L. Dixon
600 B. Street, Suite 1900
San Diego, CA 92101
Tel:  (619) 525-3990

*Attorneys for Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. Civ. P. 26.1 and 6th Cir. R. 26.1, each Appellant hereby

makes the following disclosures:

> (1)  Is said party a subsidiary or affiliate of a publicly-owned corporation?    NO

> (2)  Is there a publicly-owned corporation, not a party to the appeal, that has a financial interest in the outcome?    NO

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT.................................................1

STATEMENT OF JURISDICTION ..........................................................2

STATEMENT OF THE ISSUES ............................................................2

STATEMENT OF THE CASE...............................................................3

I.    PROCEDURAL BACKGROUND ........................................................3

II.   FACTUAL ALLEGATIONS...........................................................5

SUMMARY OF THE ARGUMENT ............................................................9

ARGUMENT ..........................................................................11

I.    THE DISTRICT COURT ERRED IN DISMISSING THE PENSION
      FUNDS' SECTION 36(b) CLAIM ..................................................11

      A.   Standard of Review .....................................................11

      B.   Section 36(b) Provides a Remedy Against the Investment Adviser,
           BFA, for Excessive Compensation Paid to Both it and its Affiliate,
           BTC ....................................................................12

      C.   The Legislative History Confirms the Narrow Meaning of the
           Section 36(b)(4) Exception..............................................18

           1.   Testimony before Congress establishes that when evaluating
                whether an investment adviser's compensation breaches the
                adviser's fiduciary duty, all affiliate compensation must be
                considered, including compensation subject to Section 17 .............18

2.    The operation of the 1970 amendments creating Section 36(b) reflects the evolution of the Act, which regulates investment adviser compensation under Section 15, not Section 17 .................22

D.    The District Court's Reading of Section 36(b) is Inconsistent with the Purpose of That Statute.......................................................26

E.    The SEC has Explicitly Adopted as Policy the Pension Funds' Position that Securities Lending Revenues are Subject to Section 36(b)..........................................................................................28

II.    THE DISTRICT COURT ALSO ERRED IN DISMISSING THE PENSION FUNDS' SECTION 36(a) CLAIM .................................33

A.    Standard of Review ................................................................33

B.    A Private Right of Action Exists under Section 36(a)..............34

CONCLUSION ....................................................................................43

CERTIFICATE OF COMPLIANCE .......................................................45

CERTIFICATE OF SERVICE ...............................................................45

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS...............46

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alexander v. Sandoval*,
    532 U.S. 275 (2001)......................................................................34

*AFSCME Local 506 v. Private Industry Council of Trumbull County*,
    942 F.2d 376 (6th Cir. 1991)...........................................................33

*Ashland Hosp. Corp. v. SEIU*,
    708 F.3d 737 (6th Cir. 2013)...........................................................18

*Astoria Fed. Sav. & Loan Assn. v. Solimino*,
    501 U.S. 104 (1991).......................................................................27

*Bancroft Convertible Fund, Inc. v. Zico Inv. Holdings, Inc.*,
    825 F.2d 731 (3d Cir. 1987).......................................................1, 39

*Bellikoff v. Eaton Vance Corp.*,
    481 F.3d 110 (2d Cir. 2007).......................................................1, 40

*Brouk v. Managed Funds, Inc.*,
    286 F.2d 901 (8th Cir. 1961)...........................................................40

*Brown v. Bullock*,
    294 F.2d 415 (2d Cir. 1961)...........................................................40

*Burks v. Lasker*,
    441 U.S. 471 (1979).......................................................................35

*Chevron U.S.A., Inc. v. NRDC*,
    467 U.S. 837 (1984).......................................................................32

*Church of the Holy Trinity v. United States*,
    143 U.S. 457 (1892).......................................................................26

*Cobb v. Contract Transport, Inc.*,
    452 F.3d 543 (6th Cir. 2006)...........................................................15

*Courie v. Alcoa Wheel & Forged Prods.*,
   577 F.3d 625 (6th Cir. 2009)...........................................................................11

*Daily Income Fund, Inc. v. Fox*,
   464 U.S. 523 (1984).................................................................15, 23, 26, 35

*Dewsnup v. Timm*,
   502 U.S. 410 (1992)........................................................................................26

*Fogel v. Chestnutt*,
   668 F.2d 100 (2d Cir. 1981)..........................................................................40

*George Fischer Foundry Sys. v. Adolph H. Hottinger Maschinenebau GmbH*,
   55 F.3d 1206 (6th Cir. 1995)...........................................................................5

*Greater Iowa Corp. v. McLendon*,
   378 F.2d 783 (8th Cir. 1967)..........................................................................40

*Jones v. Harris Assocs. L.P.*,
   559 U.S. 335 (2010).....................................................................15, 23, 25

*Lessler v. Little*,
   857 F.2d 866 (1st Cir. 1988) ........................................................1, 11, 28, 39

*Levitt v. Johnson*,
   334 F.2d 815 (1st Cir. 1964) ........................................................................11

*Leyse v. Clear Channel Broadcasting, Inc.*,
   697 F.3d 360 (6th Cir. 2012).........................................................................32

*Marks v. Newcourt Credit Group, Inc.*,
   342 F.3d 444 (6th Cir. 2003).........................................................................11

*Montclair v. Ramsdell*,
   107 U.S. 147 (1883)........................................................................................27

*Moses v. Burgin*,
   445 F.2d 369 (1st Cir. 1971) ........................................................................39

*Northstar Fin. Advisors, Inc. v. Schwab Investments*,
  615 F.3d 1106 (9th Cir. 2010)....................................................................1, 40

*Piedmont & Northern R. Co. v. ICC*,
  286 U.S. 299 (1932)...................................................................................15

*Public Citizen v. United States Dep't of Justice*,
  491 U.S. 440 (1989)...................................................................................26

*SEC v. Blackwell*,
  291 F. Supp. 2d 673 (S.D. Ohio 2003) .........................................................32

*SEC v. Cavanaugh*,
  445 F.3d 105 (2d Cir. 2006).......................................................................32

*Schwartz v. Eaton*,
  264 F.2d 195 (2d Cir. 1959).......................................................................40

*Taussig v. Wellington Fund, Inc.*,
  313 F.2d 472 (3d Cir. 1963).............................................................11, 38, 39

*Transamerica Mortg. Advisors v. Lewis*,
  444 U.S. 11 (1979)..............................................................34, 36, 37, 40

*United States v. Trent*,
  654 F.3d 574 (6th Cir. 2011).......................................................................15

## FEDERAL STATUTES

15 U.S.C. § 80a-1 ......................................................................................1

15 U.S.C. § 80a-1(b)(2) ...........................................................................35

15 U.S.C. § 80a-2.....................................................................................17

15 U.S.C. § 80a-15...................................................................................22

15 U.S.C. § 80a-15(a) ..............................................................................23

15 U.S.C. § 80a-15(c) ..............................................................................23

15 U.S.C. § 80a-17 ........................................................................................24

15 U.S.C. § 80a-35(a) ......................................................................................4

15 U.S.C. § 80a-35(b) ..................................................................3, 13, 14, 16

15 U.S.C. § 80a-35(b)(4) ........................................................................14, 25

15 U.S.C. § 80a-43 ..............................................................................2, 36, 38

28 U.S.C. § 1291 ..............................................................................................2

28 U.S.C. § 1331 ..............................................................................................2

## FEDERAL RULES

Fed. R. Civ. P. 12(b)(6) .............................................................................4, 11

Fed. R. Civ. P. 23.1 .........................................................................................4

## FEDERAL REGULATIONS AND AGENCY MATERIALS

17 C.F.R. § 270.17d-1(a) ...............................................................................24

17 C.F.R. § 270.17d-1(c) .........................................................................22, 24

*In re Norwest Bank Minnesota, N.A. and Society National Bank*,
    S.E.C. No. 94-750-CC (publicly released on May 25, 1995) ...............passim

In re Maxim Series Fund, Inc., Investment Company Act Release No. 25,878,
    2002 SEC LEXIS 3327 (Dec. 22, 2002) .........................................................4

Maxim Series Fund, Inc., Notice of Application for Exemption, Investment
    Company Act Release No. 25,840, 67 Fed. Reg. 72706 (Dec. 6, 2002).......33

## MISCELLANEOUS

S. Rep. No. 91-184 (1969) .......................................................................20, 21, 35

H.R. Rep. No. 96-1341 (1980).......................................................................42

*Mutual Fund Amendments: Hearings Before the Subcomm. on Commerce and Finance of the H. Comm. on Interstate and Foreign Commerce on H.R. 11995, S. 2224, H.R. 13754*, 91st Cong. (1969)..............................19, 21

Donna M. Nagy, *Judicial Reliance on Regulatory Interpretations in SEC No-Action Letters: Current Problems and a Proposed Framework,* 83 Cornell L. Rev. 921 (1998)................................................................31, 32

## STATEMENT REGARDING ORAL ARGUMENT

Appellants request oral argument.  This appeal requires the interpretation of the Investment Company Act of 1940, codified at 15 U.S.C. § 80a-1, *et seq*. ("the Act").  Oral argument may assist the Court in properly interpreting the Act.

Appellants raise two issues, each of which is novel for this Circuit.  The Section 36(b) issue has not been addressed by this or any other Court of Appeals.  The Section 36(a) issue has not been addressed by this Court but has fostered a split among other Courts of Appeals.  *Compare Lessler v. Little*, 857 F.2d 866 (1st Cir. 1988) (finding an implied right of action); *Bancroft Convertible Fund, Inc. v. Zico Investment Holdings, Inc.*, 825 F.2d 731 (3d Cir. 1987) (same) *with Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110 (2d Cir. 2007) (rejecting an implied right of action); *Northstar Fin. Advisors, Inc. v. Schwab Investments*, 615 F.3d 1106 (9th Cir. 2010) (same).

This case is also economically significant.  The securities lending operation at issue involves funds with assets totaling over $480 billion.  (R. 1, Complaint, 33 (¶ 155)).[1]  On average, at any given time, 20% of those securities are subject to a stock-lending arrangement.  (R. 1, Complaint, 28 (¶ 126)).  Therefore, this case involves allegations of excessive compensation related to a financial operation that is approximately $96 billion in size at any given time.

---

[1] Citations to the record are to the "Page ID" number in the electronic district-court record.

## STATEMENT OF JURISDICTION

The district court possessed jurisdiction over this case pursuant to 15 U.S.C. § 80a-43 (granting district courts subject matter jurisdiction over suits to enforce the Act), as well as under 28 U.S.C. § 1331 (granting district courts subject matter jurisdiction over suits arising under federal law).

This Court possesses jurisdiction over the appeal pursuant to 28 U.S.C. § 1291, which gives jurisdiction over appeals from final judgments of the district courts. The district court entered a final judgment dismissing all of Appellants' claims with prejudice on October 24, 2013. (R. 53, Order 919; R. 54, Entry of Judgment 920). Appellants filed a timely notice of appeal on November 8, 2013. (R. 55, Notice of Appeal 921).

## STATEMENT OF THE ISSUES

1. Whether an investment adviser is absolved from liability for excessive compensation under Section 36(b) of the Act when its affiliate conducts an activity that has been reviewed under Section 17 of the Act by the Securities and Exchange Commission, although that agency takes the position that such review does not affect the investment adviser's Section 36(b) liability?

2. Whether Section 36(a) of the Act provides a private right of action for breaches of fiduciary duty by investment advisers, officers, and directors?

# STATEMENT OF THE CASE

## I.    PROCEDURAL BACKGROUND

iShares, Inc. and iShares Trust are investment companies registered under the Act. (R. 1, Complaint, 4 (¶¶ 10-11)). Appellants, Laborers' Local 265 Pension Fund and Plumbers and Pipefitters Local No. 572 Pension Fund ("the Pension Funds"), are investors in several individual iShares funds managed by iShares, Inc. and its corporate affiliates (collectively, "BlackRock"). (R. 1, Complaint, 3-9 (¶¶ 6-31)). The Pension Funds filed this action against the iShares investment adviser, BlackRock Fund Advisors ("BFA"), and related persons and BlackRock entities for violations of the Act. (R. 1, Complaint, 3-9 (¶¶ 6-31)). The Pension Funds alleged that those entities unlawfully appropriated funds properly due to investors by charging excessive fees for lending the funds' securities to outside investors—fees that were approximately 300% of the industry standard. (R. 1, Complaint, 19 (¶73)).

In Count I, the Pension Funds sought to recover excessive compensation paid to BFA and its corporate affiliate, BlackRock Institutional Trust Company, N.A ("BTC"), pursuant to Section 36(b) of the Act, codified at 15 U.S.C. § 80a-35(b). (R. 1, Complaint, 26-28 (¶¶ 109-122)).[2]

---

[2] Based on the prevailing usage in case law, this brief generally refers to sections of the Act, rather than to sections of the United States Code, which are sometimes

In Count III, the Pension Funds also sued BFA's corporate affiliates and the responsible individual directors of the funds for breach of their fiduciary duties of care and loyalty under Section 36(a) of the Act, codified at 15 U.S.C. § 80a-35(a). (R. 1, Complaint, 43-44 (¶¶ 217-225)).[3]

The various defendants filed two motions to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6) and 23.1.  (R. 21, Motion to Dismiss, 113; R. 24, Motion to Dismiss, 426).  The district court granted the motions to dismiss on August 28, 2013.  (R. 49, Order, 908).

With regard to the Pension Funds' Section 36(b) claims, the district court held that a 2002 order from the Securities Exchange Commission ("SEC" or "Commission"), which permitted the BlackRock affiliates to jointly operate a securities lending operation, foreclosed an investor suit against both the investment adviser and the securities lending agent based on the district court's interpretation of subsection 36(b)(4).  (R. 48, Memorandum, 888, 898).[4]  The 2002 order that was the basis for the district court's decision did not state that any entity was

numbered differently.  References to "Section 15," "Section 17," and "Section 36" refer to those sections of the Act.

[3] The Pension Funds asserted a claim under another section of the Act in Count II. (R. 1, Complaint, 35-36 (¶¶ 170-175).  The Pension Funds do not seek review of the district court's dismissal of Count II.

[4] In 2002, BlackRock's predecessor, Barclays Bank, received SEC approval to use a corporate affiliate to manage its iShares securities lending program.  (R. 22, Defendants' Memorandum, 127 (citing In re Maxim Series Fund, Inc., Investment Company Act Release No. 25,878, 2002 SEC LEXIS 3327 (Dec. 22, 2002)).

exempt from the fiduciary duty imposed by Section 36(b) and was issued after BlackRock's predecessor represented that its securities lending operations were similar to those that the SEC had previously ruled were subject to that fiduciary duty.

With respect to Count III, the district court held, as a matter of law, that Section 36(a) of the Act does not provide a private right of action for investors. (R. 48, Memorandum, 888, 906).

The district court gave the Pension Funds an opportunity to amend their Complaint. (R. 49, Order, 909). The Pension Funds declined to amend their Complaint because they believe the district court erred as a matter law on the key legal issues in this case.

The district court dismissed the case with prejudice on October 24, 2013. (R. 53, Order, 919; R. 54, Entry of Judgment, 920). The Pension Funds filed a timely notice of appeal on November 8, 2013. (R. 55, Notice of Appeal 921).

## II.    FACTUAL ALLEGATIONS

This is an investor protection case under the Act. The Act regulates investment companies, including mutual funds. (R. 1, Complaint, 10 (¶ 34)).[5] A

---

[5] For purposes of this appeal, because the district court's decision was a ruling on a Rule 12(b)(6) motion, the Pension Funds' factual allegations are deemed to be true with all ambiguities resolved in favor the Pension Funds. *See*, *e.g*., *George Fischer Foundry Sys. v. Adolph H. Hottinger Maschinenebau GmbH*, 55 F.3d 1206, 1209 (6th Cir. 1995).

mutual fund is a pool of assets, consisting primarily of a portfolio of securities, belonging to the individual investors holding shares in the fund.  (R. 1, Complaint, 10 (¶ 34)).  Typically, a fund has an investment adviser that selects the funds, manages the fund's investments, and provides other services.  (R. 1, Complaint, 10 (¶ 35)).

Because of the relationship between a mutual fund and its investment adviser, the fund often cannot, as a practical matter, sever its relationship with the adviser.  (R. 1, Complaint, 10 (¶37)).  Therefore, the forces of arms-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy.  (R. 1, Complaint, 10 (¶37)).  Recognizing that the relationship between a fund and its investment adviser was fraught with conflicts of interest, the Act created protections for mutual fund shareholders.  (R. 1, Complaint, 10 (¶38)).

Following the initial passage of the Act in 1940, the SEC, the agency tasked with administering the Act, commissioned a study that found that investment advisers often charged mutual funds higher fees than those charged the advisers' other clients and further determined that the structure of the industry, even as regulated by the Act, had proved resistant to efforts to moderate adviser compensation.  (R. 1, Complaint, 11 (¶ 40)).  Congress thereafter amended the Act to add Section 36(b), which provided a cause of action to the SEC and to mutual

6

fund investors to recover excessive compensation paid to investment advisers in violation of their fiduciary duty.  (R. 1, Complaint, 11 (¶ 42)).

In the period at issue in this case, the investment adviser managing BlackRock's exchange-traded mutual funds was BFA, a wholly-owned subsidiary of BTC.  (R. 1, Complaint, 6 (¶15)). [6]  BFA contracted with BTC to manage BlackRock's securities lending operations on behalf of the funds.  (R. 1, Complaint, 27 (¶114)). [7]

The fees paid to BFA for acting as investment adviser to the Pension Funds and its affiliate BTC are grossly excessive.  (R. 1, Complaint, 17 (¶ 64)).  At least forty percent of revenue earned from securities lending transactions involving securities owned by the Pension Funds has, during the period at issue in this litigation, been taken as compensation by BFA, BTC and other BlackRock

---

[6] As alleged in the Complaint, BFA and BTC are investment advisers to the funds. (R. 1, Complaint, 26 (¶¶ 112-113)).  BFA often reinvests cash given as collateral for "borrowed" securities in short-term instruments on behalf of the Funds, and at times that collateral is reinvested in joint accounts or money market funds managed by BFA or other BlackRock affiliates.  (R. 1, Complaint, 31 (¶145)). BTC's compensation was established in an Amended and Restated Securities Lending Agency Agreement.  (R. 1, Complaint, 18 (¶ 70)).

[7] As part of the securities lending program, BlackRock actually sells the funds' stocks as part of an agreement with a short-seller, such as a hedge fund, which posts collateral to assure return of the funds' stock at a later time.  By this arrangement, the short-seller seeks to profit from a decline in the stock's price.  BlackRock makes money by receiving the return on the cash collateral held and, at times, by receiving a payment from the short-seller for access to the funds' stocks.  *See generally* (R. 1, Complaint, 11-14 (¶¶ 44-52)).

affiliates.  (R. 1, Complaint, 21 (¶ 69)).   This is approximately 300% of what is

typical in the industry.  (R. 1, Complaint, 19 (¶ 73)).   Some comparable funds

return 100% of securities lending revenues to their shareholders.  (R. 1, Complaint,

20 (¶79)).  The Pension Funds are thus being charged 40% of revenues for

securities lending services that holders of other major exchange traded funds get

for free.  (R. 1, Complaint, 21 (¶ 82)).  In *The Wall Street Journal*, columnist Jason

Zweig characterized such securities lending charges as "money for nothing."  (R.

1, Complaint, 21 (¶ 83)).   Blackrock earned $157 million on securities lending

fees in the second quarter of 2012 alone.  (R. 1, Complaint, 31 (¶ 142)).

The excessive fees imposed by BFA and BTC are consistent with a recent

academic study, which concluded that use of "sponsor affiliated lending agents"

resulted in lending returns "70% lower" than would be obtained through non-

affiliated lenders.  (R. 1, Complaint, 20 (¶79)).  The study attributed this

performance to "wealth appropriation from shareholders when the funds employ

sponsor affiliated lending agents."  (R. 1, Compliant, 20 (¶79)).

As of 2012 (the most recent year prior to the filing of the Complaint with

adequate information), the rate of return to the Pension Funds' BlackRock funds,

after paying BFA and BTC their outsized fees, for the use of the Funds' assets for

securities lending has typically been 0.25% and 0.30%.  (R. 1, Complaint, 16 (¶

61)).[8]  This compares to a rate of return of 0.93% for self-administered lending

programs and a rate of return of 0.49% for funds using unaffiliated lending agents.[9]

(R. 1, Complaint, 16 (¶ 61)).

## SUMMARY OF THE ARGUMENT

The district court erred as a matter of law by dismissing the Pension Funds'

claims under Section 36(b) and Section 36(a) of the Investment Company Act of

1940.  The district court's holding that the fiduciary duty imposed on investment

advisers and their affiliates by Section 36(b) is negated whenever an affiliate must

obtain a letter to conduct certain transactions that may be governed by Section 17

of the Act raises an issue of first impression, both in the Sixth Circuit and in the

entire nation, concerning the statute's remedies to curb excessive compensation to

investment advisers and their affiliates.  The District Court's holding is directly

contrary to the intent of Congress in enacting Section 36(b), as memorialized in

testimony by the SEC Chairman at the time of passage.  It is further contrary to the

longstanding practice of the SEC, which has for many years established that

investment advisers and affiliates engaged in securities lending operations are

---

[8] The empirical difference of the returns to investors paid by funds that use
affiliated lending agents, versus those first that self-administer or use non-affiliated
lending agents, is documented in an academic study by Professor John Adams, *et
al*., "Affiliated Agents, Boards of Directors, and Mutual Fund Security Lending
Returns" (2011).  *See generally* (R. 1, Complaint 14-16 (¶¶ 45-59)).

[9] Adams Study, *supra*; the relationship between BTC and BFA is set out in the
Form N-1A filed by iShares Trust on November 18, 2011.

governed by the fiduciary duty under Section 36(b). If upheld, the district court's decision will have a profound effect on the industry, freeing its largest actors from long-recognized fiduciary responsibilities.

The Pension Funds respectfully submit that the Investment Company Act permits investor suits against an investment adviser under Section 36(b) even when the Commission has allowed a fund manager to engage in transactions with its corporate affiliates, because investment adviser compensation contracts, as well as the compensation paid to affiliates and imputed to the investment adviser (including profit-sharing contracts), are not "subject to Section 17 of [the Act], or rules, regulations, or orders thereunder" for purposes of Section 36(b)(4) of the Act. The existence of affiliated transactions involving the investment adviser does not disrupt the express private remedy in Section 36(b) available to security holders against the investment adviser. Nor does language of Section 36(b)(4) do anything to reduce, alter, or abrogate the fiduciary duty of the investment adviser in regard to the receipt of compensation by itself and its affiliates.

The district court, in dismissing the Pension Funds' Section 36(b) claims, failed to: (1) take into account the entire language of Section 36(b); (2) take into account the pertinent legislative history; or (3) follow the Commission staff's

foundational interpretation of Section 36(b) in *In re Norwest Bank Minnesota, N.A. and Society Nat'l Bank*, 1995 SEC No-Act. LEXIS 529 (May 25, 1995).[10]

In addition, based on longstanding precedent, Congress implied private rights of action in Section 36(a) of the Act to protect investors from individual manager and director misconduct.  *See Taussig v. Wellington Fund, Inc.*, 313 F.2d 472, 476 (3d Cir. 1963) (recognizing implied private rights of action under the Act); *Levitt v. Johnson*, 334 F.2d 815 (1st Cir. 1964) (same); *Lessler v. Little*, 857 F.2d 866 (1st Cir. 1988) (same).

The judgment of the district court dismissing the Pension Funds' Section 36(b) and Section 36(a) claims should be reversed.

## ARGUMENT

## I.   THE DISTRICT COURT ERRED IN DISMISSING THE PENSION FUNDS' SECTION 36(b) CLAIM

## A.   Standard of Review

The district court's dismissal of a case pursuant to Fed. R. Civ. P. 12(b)(6) is reviewed by this Court *de novo*.  *E.g*., *Courie v. Alcoa Wheel & Forged Prods.*, 577 F.3d 625 (6th Cir. 2009) (citing *Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444 (6th Cir. 2003)).

---

[10] Also available at http://www.sec.gov/divisions/investment/noaction/1995/norwest052595.pdf (last accessed Feb. 13, 2014).

**B.    Section 36(b) Provides a Remedy Against the Investment Adviser, BFA, for Excessive Compensation Paid to Both it and its Affiliate, BTC**

Congress' manifest purpose in enacting Section 36(b)—evident from the statutory language, as well as the legislative history and the position of the SEC—was to permit a private lawsuit against the investment adviser for excessive compensation paid to it and its affiliates.  The district court's decision does not uphold that legislative intent.  It mistakenly interprets an exception, found in Section 36(b)(4), so broadly that it would remove most affiliate compensation from the purview of Section 36(b).  This not only makes no sense and needlessly ignores the language of the statue, but it is directly contrary to the intended operation of the Act, as very clearly evidenced by the testimony of the SEC Chairman when he appeared before Congress to explain the proper operation of the statute that his agency had negotiated with industry representatives.  It also is contrary to the SEC's long held position that investment advisers to mutual funds and their affiliates that engage in securities lending are subject to Section 36(b)'s fiduciary duty with respect to securities lending income.

Under the correct interpretation, the egregious compensation paid to BFA and its corporate affiliate BTC as part of the BlackRock securities lending operation is remediable under Section 36(b).  Congress' entire purpose in creating Section 36(b) in 1970 was to stop this sort of overcompensation of investment advisers and their corporate affiliates. Section 36(b) accomplished that purpose by

(1) creating an express cause of action for investors to recover excessive compensation paid to the investment adviser and its affiliates and (2) establishing a fiduciary duty on the part of that investment adviser that takes in account both the adviser's *and its affiliates'* compensation.  Section 36(b)(4) was intended to prevent separate suits against the investment adviser's affiliates focused only on their particular compensation; however, the affiliates' compensation must still be taken into account in a fiduciary duty suit against the investment adviser.  For this reason, the district court incorrectly over-extended Section 36(b)(4) to dismiss the Pension Funds' suit against the investment adviser, BFA.

Section 36(b) permits an investor in a registered investment company to sue either the investment adviser "or any affiliated person of such investment adviser" for "breach of fiduciary duty in respect of . . . compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person."  15 U.S.C. § 80a-35(b).

Critically, the statute defines the investment adviser's fiduciary duty to encompass compensation paid to affiliates:

> For the purposes of this subsection, the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, **to such investment adviser or any affiliated person** of such investment adviser.

*Id*. (emphasis added).  This provision holds the investment adviser responsible for the total sum of compensation paid to it and all of its affiliates.  The main operative language of the statute clearly contemplates that a lawsuit against the investment adviser will take into account affiliate compensation.

Section 36(b)(4) creates an exception to an investor's cause of action for breach of fiduciary duty.  It states in pertinent part, "This subsection shall not apply to compensation or payments made in connection with transactions subject to section 17 of this title, or rules, regulations, or orders thereunder . . . ."  *Id*. § 80a-35(b)(4).  The statute does not further define these terms.

Looking at the operative language of Section 36(b), as well as the exception in Section 36(b)(4), a court must reconcile the investment adviser's fiduciary duty with regard to its affiliates' compensation and the requirement in Section 17 that affiliate transactions receive SEC approval.  Put simply, did Congress take away with Section 36(b)(4) the remedy against the investment adviser that it created with the main operative language of Section 36(b)?  The Pension Funds respectfully submit that Congress did not, based on the entire language of the Act, the legislative history of the Act, and Congress' purposes in passing the Act.

Two rules of statutory construction are especially important in this context.  First, the Court should interpret the statute as a whole, avoiding inconsistencies

and giving meaning to every provision.  *See*, *e.g.*, *United States v. Trent*, 654 F.3d 574, 593 (6th Cir. 2011), *cert. denied*, 132 S. Ct. 1542 (2012).

Second, the Court should interpret Section 36(b)(4) narrowly because it is an exception to a remedial statute.  "[R]emedial statutes should be construed broadly to extend coverage and their exclusions or exceptions should be construed narrowly."  *Cobb v. Contract Transport, Inc.*, 452 F.3d 543, 559 (6th Cir. 2006).  Section 36(b) is indisputably remedial.  Congress enacted it in 1970 to "remedy . . . perceived inadequacies in the Act" by allowing investors to challenge excessive compensation.  *See Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 537-39 (1984).  Section 36(b)(4) limits the remedy by creating an exception.  Accordingly, the exception itself "should be narrowed and limited to effect the remedy intended."  *Cf. Piedmont & Northern R. Co. v. ICC*, 286 U.S. 299, 311-12 (1932).

A proper reading of Section 36(b) as a whole allows the Pension Funds to recover from the investment adviser to the extent that the total compensation received by it and its affiliates exceeds "the range of fees that might result from arm's length bargaining as the benchmark for reviewing challenged fees."  *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 347 (2010).  As 36(b) states, in evaluating the investment adviser's compensation, the Court must look not only at the investment adviser's direct compensation but that of all affiliates.  The proviso in Section 36(b)(4) merely states that Section 36(b) would "not apply" to permit  a cause of

15

action against an affiliate for recovery of "compensation or payments" generated by transactions regulated by Section 17.  It does not stand for the proposition that such compensation cannot be considered in determining whether an investment adviser's compensation is reasonable under Section 36.

Thus, for example, in this case, BFA, which Appellees concede is an investment adviser, has a fiduciary duty not to charge excessive compensation.  In determining whether its compensation is excessive, courts must examine all "payments of a material nature" made to BFA "or any affiliated person"—such as its affiliated lending agent, BTC—to determine whether BFA has been charging its investors too much.  Even if considered "subject to" Section 17, BTC's compensation for those services remains relevant to the fiduciary duties that BFA, as investment adviser, owes to investors.  The first, operative sentence of Section 36(b) still imputes all affiliate compensation—including that of BTC—to BFA for purposes of deciding whether BFA fulfilled its fiduciary duty.  *See* 15 U.S.C. § 80a-35(b) ("[T]he investment adviser . . . shall be deemed to have a fiduciary duty with respect to the receipt of compensation . . . to such investment adviser or any affiliated person . . . .").  For example, if an affiliate's compensation is too high, then the investment adviser may comply with its fiduciary duty by accepting a

lower management fee from the investment company. This interpretation gives meaning to all parts of the statute and preserves its remedial effect.[11]

The district court's reading of the statute does not. In a single paragraph, the district court determined, "By the plain text of Section 36(b)(4), the SEC Exemption Order removes the transaction at issue from the scope of Section 36(b)." (R. 48, Memorandum, 896). This treats affiliate compensation, to the extent it is subject to Section 17, as completely invisible for purposes of determining whether, under Section 36(b), an investment adviser's compensation is reasonable. The effect of this interpretation is to undermine Congress' intent that the adviser's compensation must be viewed in the context of all compensation provided "to such investment adviser or any affiliated person of such investment adviser."

As detailed below, the district court's unprecedented reading of the proviso in Section 36(b)(4) is entirely contrary to the intent of Congress, as set out in the legislative history surrounding the Act, and is at odds with the SEC's longstanding policy recognizing that Section 36(b) applies to securities lending operations.

---

[11] BTC is also independently liable for excessive compensation because, unlike most affiliates, BTC is also an investment adviser in its own right and thus, as detailed below, is by definition excluded from the ambit of Section 17. The Act defines an investment adviser as "any person …. empowered to determine what securities or other property shall be purchased and sold by such company." 15 U.S.C. § 80a-2. Plaintiffs have alleged that BTC "manages securities lending transactions for the Funds" at issue and that such transactions by definition involve the sale of securities. (R. 1, Complaint, 12, 16 (¶¶ 45, 60)).

**C.    The Legislative History Confirms the Narrow Meaning of the Section 36(b)(4) Exception**

**1.    Testimony before Congress establishes that when evaluating whether an investment adviser's compensation breaches the adviser's fiduciary duty, all affiliate compensation must be considered, including compensation subject to Section 17**

This very issue before the Court was addressed in detail by the Chairman of the SEC when he appeared before Congress at the time Section 36(b) was enacted. To the extent Section 36(b)(4) can be viewed as ambiguous, the legislative history clears up any ambiguity and entirely corroborates the Pension Funds' reading.[12]

Hamer H. Budge, the Chairman of the SEC, testified before Congress on the background and meaning of the bill that became Section 36(b). His testimony includes a specific discussion of Section 36(b)(4):

> I think a few additional comments are appropriate in connection with this provision. Section 36(b)(4) specifies that the sub-section shall not apply to compensation or payments made in connection with transaction subject to section 17 of the act or rules thereunder, or to sales loads.
>
> The reasons for this exclusion are, (1) section 17 of the act presently provides limitations on self-dealing by persons affiliated with an investment company, and (2) section 22(b) of the act . . . provides for limitations on excessive sales loads . . . . Therefore, it is not necessary to specify a separate fiduciary duty with respect to these activities. **However, any amounts received from whatever source by an investment adviser, its affiliates and other persons specified in section 36(a) in transactions subject to section 17 or 22 could, of course, be**

---

[12] If a statute is ambiguous, a court may properly consider its legislative history. *Ashland Hosp. Corp. v. SEIU*, 708 F.3d 737, 743 (6th Cir. 2013), *cert. denied*, 134 S. Ct. 257 (2013).

> **taken into account by a court in determining whether the advisory fees meet the standards of section 36(b).** Thus, for example, brokerage commissions received by a broker-dealer affiliated with an investment adviser for portfolio transactions handled by the broker-dealer for a fund advised by such adviser could be taken into account in determining whether the adviser should have reduced its fees because of the benefits it received from the brokerage commissions. This would be the result despite the fact that such brokerage commissions would be permitted by section 17(e) of the Investment Company Act.

*Mutual Fund Amendments: Hearings Before the Subcomm. on Commerce and Finance of the H. Comm. on Interstate and Foreign Commerce on H.R. 11995, S. 2224, H.R. 13754, and H.R. 14737*, 91st Cong. 177-178 (1969) (emphasis added).

Chairman Budge's explanation is critical evidence of the meaning of Section 36(b)(4). First, the parties have not located any other piece of legislative history that specifically explains Section 36(b)(4). Second, Chairman Budge was uniquely well-positioned to give this explanation because the SEC negotiated the final language of the statute. *See id*. at 174 ("At the urging of the Senate committee and your committee, we renewed discussions with representatives of the industry. The agreements which were reached in these discussions were embodied in S. 2224 . . . .").

The Senate report accompanying the 1970 amendments reflects Chairman Budge's understanding of how Section 36(b) operates:

> An action for breach of fiduciary duty may be brought not only against the investment adviser but also against any officer, director, member of any advisory committee, depositor, or

principal underwriter of the investment company who, under the circumstances, may also have a fiduciary duty in respect to the payments received. **The fiduciary duty of the investment adviser is extended not only to compensation paid to the investment adviser but also to payments made by the investment adviser or its shareholders to an affiliated person of the investment adviser. This provision affords a remedy if the investment adviser should try to evade liability by arranging for payments to be made not to the adviser itself but to an affiliated person of the adviser.**

S. Rep. No. 91-184, at 16 (1969), *reprinted in* 1970 U.S.C.A.N.N. 4897, 4910-11 (emphasis added).

As this legislative history demonstrates, Section 36(b)(4) was intended to keep an investment adviser's affiliate from being subject to both Section 17 and a Section 36(b) suit at the same time. That could create conflicting standards for the affiliate, so Section 36(b) gives way. However, as SEC Chairman Budge explained, the limited proviso in Section 36(b)(4) does not apply to the investment adviser and does nothing to alter, reduce, or abrogate the investment adviser's fiduciary duty to ensure that its compensation is not excessive, as required by the first sentence of Section 36(b). The investment adviser remains liable for its breach of fiduciary duty, and payments to affiliates are treated as compensation to the investment adviser.

This entirely validates the Pension Funds' claims. The Pension Funds have alleged that BFA is an investment adviser and Appellees do not dispute that point. Under Section 36(b), "the adviser has a fiduciary duty with respect to

compensation for services or other payments paid by the fund or its shareholders to the adviser or to affiliated persons of the adviser." *Id*., at 6, *reprinted in* 1970 U.S.C.A.N.N. at 4902. The Pension Funds have pled that in this case the compensation of BFA, considered with its affiliates as required under Section 36(b), was excessive and in violation of its Section 36 fiduciary duty. Whether or not some of its affiliates' transactions can be deemed subject to Section 17—and thus to fall under the exception in Section 36(b)(4)—the affiliates' compensation must, as Chairman Budge explained, "be taken into account by a court in determining whether the advisory fees meet the standards of section 36(b)." *Mutual Fund Amendments*, 91st Cong. 178. The Pension Funds were clearly correct to include BTC's securities lending income in the calculation of compensation paid to investment adviser BFA. In addition, the Pension Funds have properly alleged that BTC was also an investment adviser because its activities fit the statutory definition. The same analysis thus also applies with equal force to BTC.

The entire purpose of Section 36(b)—preventing excessive advisory compensation—would be defeated if advisers could avoid a meaningful examination of their compensation by simply shifting it to affiliated entities regulated under Section 17. Section 36(b)(4) does not, as the district court held,

prevent a court from considering income generated by affiliated transactions when determining whether an adviser is charging excessive advisory fees.

### 2. The operation of the 1970 amendments creating Section 36(b) reflects the evolution of the Act, which regulates investment adviser compensation under Section 15, not Section 17

SEC Chairman Budge's explanation of the 1970 Amendments that created Section 36(b) reflects the structure of the Act, which has historically applied special standards to investment advisers. Thus, prior to the 1970 amendments, the Commission, in Rule 17d-1(c), specifically removed investment adviser compensation contracts (and compensation contracts with the investment adviser's affiliates) from the ambit of Section 17. *See* 17 C.F.R. § 270.17d-1(c). For that reason, the investment-adviser compensation contracts that are at the heart of this case are not "subject to section 17 of this title, or rules, regulations, or orders thereunder" for purposes of Section 36(b)(4). The Commission's separation of investment adviser compensation contracts from its Section 17 review process, through Rule 17d-1(c), makes sense. Adviser compensation is regulated separately under Section 15 of the Act. *Cf.* 15 U.S.C. § 80a-15. Therefore, when Congress added Section 36(b) to the Act in 1970, it created a clear fiduciary duty by investment advisers, like BFA and BTC, with regard to their compensation and that of their affiliates. Section 36(b)(4) did not diminish that duty by limiting direct actions against affiliates regulated under Section 17.

As explained by the Supreme Court, a mutual fund is a pool of assets, consisting primarily of a portfolio of securities, belonging to the investors in the mutual fund. *Jones*, 559 U.S. at 338. Typically, a separate entity, called an "investment adviser," creates the mutual fund, selects the fund's directors, manages the fund's investments, and provides other services. *Id.* When Congress originally passed the Investment Company Act of 1940, it sought to alleviate the problem of the inherent conflict of interest between mutual fund investors and the mutual fund's investment adviser. *Id.* at 339; *see also Daily Income Fund*, 464 U.S. at 536-37 (describing Congressional purpose of ameliorating conflict of interest between investment adviser and fund investors).

One of the protections for fund investors in the original Act involved the primary investment adviser contract. Section 15 of the Act requires that investment adviser contracts be in writing, precisely describe the compensation to be paid to the adviser, last no longer than two years, and have no termination penalty. 15 U.S.C. § 80a-15(a). In addition, Section 15 requires that a majority of disinterested directors of the fund approve the investment adviser contract. *Id.* § 80a-15(c).

Another protection for fund investors in the original Act involved transactions between the investment adviser and its corporate affiliates. Section 17 of the Act prohibits affiliates of the investment company from buying or selling

securities held by the investment company, borrowing money or other property of the investment company, or loaning money to the investment company. *Id*. § 80a-17(a). In addition, Section 17 generally prohibits affiliates of the investment company from participating in joint ventures with the investment company. *Id*. § 80a-17(d). Finally, Section 17 prohibits affiliates of investment companies from receiving third-party compensation for services performed on behalf of the investment company, or from receiving excessive fees for acting as broker for the investment company. *Id*. § 80a-17(e).

In 1956, the Commission passed Rule 17d-1, reflecting the fact that investment advisers were governed by Section 15, not Section 17. In subsection (a) of Rule 17d-1, the Commission prohibited investment companies from engaging in a "joint enterprise or other joint arrangement or profit-sharing plan" in which the investment company is a participant, absent prior Commission approval. 17 C.F.R. § 270.17d-1(a). Importantly, the Commission specifically excised "an investment advisory contract subject to section 15 of the Act" from its broad definition of a joint enterprise under Section 17. *Id*. § 270.17d-1(c). Thus, long before Congress undertook to impose heightened standards on investment adviser contracts, it was understood that those arrangements were not regulated under Section 17.

As described by the Supreme Court, Congress amended the Act in 1970 to solve "problems relating to the independence of investment company boards and the compensation received by investment advisers." *Jones*, 559 U.S. at 339. First, the 1970 amendments limited the number of "interested persons" who could be fund directors. *Id*. Second, the 1970 amendments "imposed upon investment advisers a 'fiduciary duty' with respect to compensation received from a mutual fund . . . and granted individual investors a private right of action for breach of that duty." *Id*. at 340 (citations omitted).

Thus, in Section 36(b), Congress in 1970 established a clear fiduciary duty, recoverable directly by aggrieved investors, on the part of investment advisers for their compensation and that of their affiliates. In light of that fact that, under Rule 17d-1(c), investment adviser contracts were not even part of a Section 17 transaction, Congress' decision in Section 36(b)(4) to separate Section 17 transactions from the operation of Section 36(b) did not affect the fiduciary duty obligation of investment advisers with regard to their own compensation or the procedure for investors to contest that compensation. Investment adviser contracts themselves were (and are) simply not "subject to section 17 of this title, or rules, regulations, or orders thereunder." *See* 15 U.S.C. § 80a-35(b)(4). But, as Chairman Budge testified, the compensation taken by an investment adviser under such a contract necessarily had to be evaluated in light of the total compensation

received by the adviser and all of its affiliates, including compensation from transactions subject to Section 17. Otherwise, an investment adviser could charge inflated fees to mutual funds it advised by simply shifting that fee to an affiliated entity.

**D.    The District Court's Reading of Section 36(b) is Inconsistent with the Purpose of That Statute**

The district court's interpretation of Section 36(b)(4), in lumping together investment adviser contracts with all affiliate transactions implicating Section 17, results in irrational outcomes. "If possible, we should avoid construing the statute in a way that produces such absurd results." *Dewsnup v. Timm*, 502 U.S. 410, 427 (1992) (Scalia, J., dissenting). "Where the literal reading of a statutory term would compel an odd result, we must search for other evidence of congressional intent to lend the term its proper scope." *Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 454 (1989) (internal citation and quotations omitted); *see also Church of the Holy Trinity v. United States*, 143 U.S. 457, 472 (1892).

Virtually all transactions between an investment adviser and its affiliates involving fund property implicate Section 17. *See Daily Income Fund*, 464 U.S. at 536 (citing Section 17 for the proposition that "Congress established a scheme that regulates most transactions between investment companies and their advisers"). If the district court's interpretation of Section 36(b)(4) is correct, there are no practical instances in which the investment adviser's "fiduciary duty with respect

to . . . payments of a material nature, paid by such registered investment company or by the security holders thereof, to . . . any affiliated person of such investment adviser" established in Section 36(b) would lead to liability for the investment adviser.  Section 36(b)(4) would take away the very remedy that 36(b) itself provides.

The district court's reading of subsection 36(b)(4) would therefore render a substantial portion of the text of Section 36(b) surplusage. "It is the duty of the court to give effect, if possible, to every clause and word of a statute. . . ." *Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883). "But of course we construe statutes, where possible, so as to avoid rendering superfluous any parts thereof." *Astoria Fed. Sav. & Loan Assn. v. Solimino*, 501 U.S. 104, 112 (1991). In Section 36(b) Congress imposed a fiduciary duty on the investment adviser in regard to the compensation and payments made to affiliates.  Section 36(b)(4) should not be read in such a way to make that aspect of the fiduciary duty meaningless.

As interpreted by the district court, the first sentence of Section 36(b) is concerned with the compensation of or payments to "an affiliated person of the investment adviser," but Section 36(b)(4), as interpreted by the district court, eliminates Congress' chosen mechanism for questioning such compensation, because Section 17 transactions invariably involve affiliate transactions.  Under the district court's interpretation, only if an affiliate directly violates Section 17 (such

as by failing to get an SEC exemption permitting an affiliate transaction in the first place) will the affiliate have any liability for its conduct.[13]  Even then, based on the district court's interpretation, an investment adviser would have no actionable fiduciary duty with respect to compensation paid to the investment adviser or to its affiliates.

**E.    The SEC has Explicitly Adopted as Policy the Pension Funds' Position that Securities Lending Revenues are Subject to Section 36(b)**

The SEC has long taken the position that the compensation earned by an investment adviser or affiliate from securities lending—the precise form of transaction at issue—is governed by the fiduciary duty set out in Section 36(b) even where the SEC has permitted the securities lending operations in question with a letter issued pursuant to Section 17.  In a formal decision, approved by the Commission and published on May 25, 1995, the Commission considered Norwest Bank's request to permit an affiliate to act as a custodian of the bank's mutual-fund securities-lending operation.  *See In re Norwest Bank Minnesota, N.A. and Society*

---

[13] Only one reported Court of Appeals decision, *Lessler*, 857 F.2d 866, has applied Section 36(b)(4).  While not dealing with a Section 15 investment adviser contract (as in this case), that case illustrates how the protections of Section 36(b) operate when a party subject to the Act violates Section 17.  After first determining that the Act contains implied private rights of action, the First Circuit held that the plaintiff's private right of action, which was based on a violation of Section 17 of the Act, precluded recovery under Section 36(b).  As the First Circuit reasoned, liabilities for violation of Section 17 and for violation of Section 36(b) are "mutually exclusive" based on the "subject to Section 17" language of section 36(b)(4).  *Id*. at 874.

*National Bank*, 1995 SEC No-Act. LEXIS 529 (May 25, 1995). *Norwest* is the

foundational Commission decision permitting funds' corporate affiliates to

participate in the funds' stock-lending operations.

*Norwest* leaves no doubt that the SEC's interpretation of Section 36(b) and

Section 17 is one hundred percent aligned with that of the Pension Funds. In

*Norwest*, the Commission's Office of Chief Counsel addressed whether a securities

lending program run by a custodian affiliated with an investment adviser would be

prohibited by Sections 17(d) and (e) of the Act. *Id*., at **5-8. Concluding that it

would not take action under section 17(e) to prohibit the securities lending

operation, the Chief Counsel's Office emphasized that compensation earned would

be constrained by the fiduciary duty imposed by Section 36(b):

> [o]ur position does not mean that there are no limits on how
> much a Fund may compensate its affiliated Custodian. A
> Fund's board of directors has a fiduciary obligation to ensure
> that the compensation paid to any service provider, especially
> one that is affiliated with the Fund or its adviser, is not
> excessive. **Additionally, we note that the Custodian's
> compensation would be subject to section 36(b) of the
> Investment Company Act and, therefore, must fall within
> the range of what would have been negotiated by the parties
> at arm's length.**

*Id*., at *10 (emphasis added). In the same vein, in ruling that Rule 17d-1 did not

apply to the *Norwest* securities-lending program (as in this case, BFA, by operation

of Rule 17(d)-1(c) is not impacted), the Chief Counsel's Office again emphasized

that Section 36(b) remains the mechanism to contest adviser compensation

arrangements:

> Although rule 17d-1 does not apply to the Program, we note
> that **section 36(b) of the Investment Company Act expressly
> places a fiduciary duty on investment advisers with respect
> to any compensation paid to affiliated persons of the
> adviser.**

*Id.*, at *12 n.14 (emphasis supplied).

The *Norwest* no-action letter is the SEC's definitive interpretation of

Sections 17 and 36(b) with respect to securities lending—the specific activity at

issue in this case.  On its website, addressing "Securities Lending by U.S. Open-

End and Closed-End Investment Companies," the SEC confirms that *Norwest* sets

out the legal foundation for securities lending by funds subject to the Act:

> Notwithstanding these (and other) 1940 Act provisions, **funds
> engage in securities lending, in large part in reliance on the
> following staff no-action letters addressing the following
> areas:**
>
> *        *        *
>
> ***Norwest Bank Minnesota, N.A.**; **Society National Bank** . . .
> **Section 36 of the Investment Company Act and fiduciary
> duty of advisers with respect to any compensation paid to
> affiliated persons of the adviser** . . . .

http://www.sec.gov/divisions/investment/securities-lending-open-closed-end-

investment-companies.htm (emphasis supplied) (last accessed Feb. 13, 2014).

In keeping with this position, the SEC has since incorporated *Norwest* into

numerous Releases authorizing securities lending by the nation's leading mutual

funds.[14] By incorporating *Norwest* into its releases, the SEC has made it the

formal position of the agency, entitled to the highest degree of judicial deference.

Courts are split on whether no-action letters are themselves entitled to deference or

are merely persuasive. *See* Donna M. Nagy, *Judicial Reliance on Regulatory*

*Interpretations in SEC No-Action Letters: Current Problems and a Proposed*

[14] *See*, *e.g.*, Notice of Application for Exemption, Investment Company Act Release No. 26,073, 68 Fed. Reg. 36602 (June 18, 2003) (order granted at 2003 SEC LEXIS 3128 (July 9, 2003)); Notice of Application for Exemption, Investment Company Act Release No. 25,840, 67 Fed. Reg. 72706 (Dec. 6, 2002) (order granted at 2002 SEC LEXIS 3327 (Dec. 27, 2002)); Notice of Application for Exemption, Investment Company Act Release No. 25,424, 67 Fed. Reg. 9010 (Feb. 27, 2002) (order granted at 2002 SEC LEXIS 659 (Mar. 19, 2002)); Notice of Application for Exemption, Investment Company Act Release No. 25,218, 66 Fed. Reg. 54313 (Oct. 26, 2001) (order granted at 2001 SEC LEXIS 2593 (Nov. 16, 2001)); Notice of Application for Exemption, Investment Company Act Release No. 24,404, 65 Fed. Reg. 25521 (May 2, 2000) (order granted at 2000 SEC LEXIS 998 (May 18, 2000)); Notice of Application for Exemption, Investment Company Act Release No. 24,126, 64 Fed. Reg. 61952 (Nov. 15, 1999) (order granted at 1999 SEC LEXIS 2552 (Dec. 1, 1999)); Notice of Application for Exemption, Investment Company Act Release No. 24,084, 64 Fed. Reg. 56823 (Oct. 21, 1999) (order granted at 1999 SEC LEXIS 2383 (Nov. 9, 1999)); Notice of Application for Exemption, Investment Company Act Release No. 23,956, 64 Fed. Reg. 46735 (Aug. 26, 1999) (order granted at 1999 SEC LEXIS 1860 (Sept. 14, 1999)); Notice of Application for Exemption, Investment Company Act Release No. 22,693, 62 Fed. Reg. 30902 (June 5, 1997) (order granted at 1997 SEC LEXIS 1328 (June 24, 1997)); Notice of Application for Exemption, Investment Company Act Release No. 22,679, 62 Fed. Reg. 29165 (May 29, 1997) (order granted at 1997 SEC LEXIS 1280 (June 17, 1997)); Notice of Application for Exemption, Investment Company Act Release No. 22,541, 62 Fed. Reg. 11232 (Mar. 11, 1997) (order granted at 1997 SEC LEXIS 717 (April 1, 1997); Notice of Application for Exemption, Investment Company Act Release No. 22,181, 61 Fed. Reg. 46874 (Sept. 5, 1996) (order granted at 1997 SEC LEXIS 695 (Mar. 28, 1997)); Notice of Application for Exemption, Investment Company Act Release No. 21,878, 61 Fed. Reg. 16658 (Apr. 16, 1996) (order granted at 1996 SEC LEXIS 1343 (May 10, 1996)).

*Framework*, 83 Cornell L. Rev. 921, 981 (1998) (concluding that "most federal district courts presented with regulatory interpretations in no-action letters have, in fact, deferred to that authority in resolving interpretive issues"). However, an SEC Release "represents an interpretation of the Commission that is entitled to deference under *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984)." *SEC v. Blackwell*, 291 F. Supp. 2d 673, 694 (S.D. Ohio 2003) (parallel citations omitted); *see also SEC v. Cavanaugh*, 445 F.3d 105, 114 n.20 (2d Cir. 2006) ("We owe [*Chevron*] deference to the SEC's release."). Releases are accorded this high degree of deference because the Commission itself issues them after notice and opportunity for hearing and typically publishes them in the Federal Register.[15] If Congress has not directly spoken to the precise question at hand, *Chevron* requires that courts defer to the agency's interpretation, unless it is arbitrary, capricious or manifestly contrary to the statute. *Leyse v. Clear Channel Broadcasting, Inc.*, 697 F.3d 360, 372 (6th Cir. 2012).

The district court did not take issue with the SEC's reasoning in *Norwest* but sought to distinguish the securities lending activities of BTC from those addressed in the SEC's determination. (R. 48, Memorandum, 897). This is plain error. As the district court observed, Appellees base their defense in this case on an

---

[15] For a discussion of the formal process used by the SEC to issue releases, *see* Nagy, *Judicial Reliance on Regulatory Interpretation in SEC No-Action Letters*, 83 Cornell L. Rev. at 932-33.

exemption order received from the SEC.  (R. 48, Memorandum, 894).  But in obtaining that order, Appellees' predecessors specifically "represented that the duties to be performed by the lending agent will not exceed the parameters set out in *Norwest Bank, N.A.* (pub. Avail. May 25, 1995)."  Maxim Series Fund, Inc., Notice of Application for Exemption, Investment Company Act Release No. 25,840, 67 Fed. Reg. 72706, 72707 (Dec. 6, 2002).  And even if the facts were not as Appellees represented, that would not somehow diminish the application of *Norwest*, which simply recognizes that Section 36(b) applies to income from securities lending transactions conducted, as in *Norwest* and in this case, by affiliates of an investment adviser.  The district court's interpretation of Section 36(b)(4) contradicts the foundational interpretation of the Act by the Commission's Office of the Chief Counsel in *Norwest* and thereby nullifies the fiduciary duty standard for investment advisers and the mechanism of redress established by Congress in Section 36(b).

## II. THE DISTRICT COURT ALSO ERRED IN DISMISSING THE PENSION FUNDS' SECTION 36(a) CLAIM

## A. Standard of Review

Whether a statute creates an implied private right of action is a legal issue that is reviewed *de novo*.  *AFSCME Local 506 v. Private Industry Council of Trumbull County*, 942 F.2d 376, 378 (6th Cir. 1991).

**B.**    **A Private Right of Action Exists under Section 36(a)**

Whether a statute establishes a private right of action for breach of a statutory duty is determined by Congressional intent.  *Alexander v. Sandoval*, 532 U.S. 275, 288 (2001).  In this case, the Pension Funds asserted in their Complaint that Appellees, particularly the individual defendants, are liable for their violations of Section 36(a) as an implied private right of action, for misconduct in approving compensation and profit-making opportunities for themselves and their affiliates through BlackRock's short-selling operations.  The Pension Funds respectfully submit that Congress' language in the Act, the legislative history of the Act, and Congress' purpose and policy in the Act, all show that Congress intended for investors to be able to pursue remedies for breaches of the Act in federal court by individuals subject to Section 36(a).  This interpretation of the statute is supported by a decision of the Supreme Court, *Transamerica Mortgage Advisors v. Lewis*, 444 U.S. 11(1979), and the majority of the Courts of Appeals to have considered the issue both before and after *Transamerica*.

Congress declared the purpose and policy behind the Act as follows:

> [T]he national public interest and the interest of investors are adversely affected—
>
>         *     *     *
>
> (2) when investment companies are organized, operated, managed, or the portfolio securities are selected, in the interest of directors, officers, investment advisers, depositors, or other affiliated persons thereof, in the interest of underwriters,

brokers, or dealers, in the interest of special classes of their security holders, or in the interest of other investment companies or persons engaged in other lines of business, rather than in the interest of all classes of such companies' security holders[.]

15 U.S.C. § 80a-1(b)(2).

As later characterized by the Supreme Court, Congress passed the Act

> because of its concern with "the potential for abuse inherent in the structure of investment companies." *Burks v. Lasker*, 441 U.S. 471, 480 (1979). Unlike most corporations, an investment company is typically created and managed by a pre-existing external organization known as an investment adviser. *Id*. at 481. Because the adviser generally supervises the daily operation of the fund and often selects affiliated persons to serve on the company's board of directors, the "'relationship between investment advisers and mutual funds is fraught with potential conflicts of interest.'" *Id*., quoting *Galfand v. Chestnutt Corp*., 545 F.2d 807, 808 (CA2 1976). In order to minimize such conflicts of interest, Congress established a scheme that regulates most transactions between investment companies and their advisers; limits the number of persons affiliated with the adviser who may serve on the fund's board of directors; and requires that fees for investment advice and other services be governed by a written contract approved both by the directors and the shareholders of the fund.

*Daily Income Fund*, 464 U.S. at 536-37 (statutory citations omitted).[16]

---

[16] *See also* S. Rep. No. 91-184, *reprinted in* 1970 U.S.C.A.N.N. 4903, 4931:

> Under the proposed legislation either the SEC or a shareholder may sue in court on a complaint that a mutual fund's management fees involve a breach of fiduciary duty.

> \*       \*       \*

> [P]roposed section 36(a) would authorize actions to enjoin breaches of fiduciary duty involving personal misconduct . . . .

When Congress passed the Investment Company Act of 1940, it provided federal district court jurisdiction over "all suits in equity and actions at law brought to enforce any liability or duty created by, or to enjoin any violation of" the Act. *See* 15 U.S.C. § 80a-43. By providing jurisdiction for "actions at law" (*i.e*., suits for monetary judgments) "to enforce any liability or duty created by" the Act, Congress showed its intent that parties harmed by violations of the Act have an implied right of action to remedy the harm by receiving money damages. Congress' use of its "actions at law . . . to enforce any liability duty" language parallels other regulatory schemes passed by Congress, such as the Public Utility Holding Company Act of 1935, which gave the federal courts jurisdiction "of all suits in equity and actions at law brought to enforce any liability or duty created by" the statute; in contrast, the Investment Advisers Act of 1940 (the companion legislation to the Investment Company Act of 1940), specifically omitted the phrase "actions at law" and the word "liability" from its grant of jurisdiction. *See Transamerica*, 444 U.S. at 15-20. The Supreme Court held that the omission of the phrase "actions at law" from the IAA meant that the implied private right of action under the IAA could only result in equitable relief. *Id*. at 24 ("[W]e hold that there exists a limited private remedy under the Investment Advisers Act of 1940 to void

In appropriate cases, nonfeasance of duty or abdication of responsibility would constitute a breach of fiduciary duty involving personal misconduct.

an investment advisers contract . . . ."). In so ruling, the Supreme Court specifically stated, "[U]nder the Investment Company Act of 1940 which was enacted as companion legislation [to the IAA], Congress expressly authorized private suits for damages in prescribed circumstances." *Id*. at 20.

As part of the original Act, Congress proscribed "gross misconduct" or "gross abuse of trust" by investment company officers, directors, and advisers in Section 36. In the 1970 amendments to the Act, Congress broadened Section 36 (newly designated subsection 36(a)) of the Act to proscribe mere "misconduct" and explicitly amended Section 36 to proscribe "breaches of fiduciary duty involving personal misconduct in respect of any registered investment company" by managers, directors, and advisers. Congress also created a new subsection, Section 36(b), involving "breach of fiduciary duty with respect to the receipt of compensation for servicers, or of payments of a material nature, paid by such registered investment company . . . to such investment adviser or any affiliated person of such investment adviser." In that subsection, Congress established an explicit private right of action and procedure for investors to allege breaches of fiduciary duty by fund investment advisers regarding their, and their affiliates', compensation schemes.

The contrasts between Section 36(a) and Section 36(b) are significant, showing that they establish separate standards and procedures for liability under

the Act. Section 36(a) proscribes personal misconduct; Section 36(b) does not require proof "that any defendant engaged in personal misconduct." Section 36(a) proscribes all breaches of fiduciary duty by defined individuals (e.g., managers, officers, directors of investment companies) "in respect of any registered investment company;" Section 36(b) permits breach of fiduciary duty suits against the "investment adviser," which may be "a corporate or other trustee performing the functions of an investment adviser." Section 36(a) broadly encompasses individuals' fiduciary duties "in respect of any registered investment company;" Section 36(b) encompasses fiduciary duties only "with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser." Finally, Section 36(a) permits suits against the individual engaging in misconduct (such as a fund director), whereas Section 36(b) permits recovery only against the party who was "the recipient of [] compensation or payments."

The majority of the Courts of Appeals that have considered the issue have recognized implied private rights of action under the Investment Company Act. For example, the Third Circuit held in 1963 that implied private rights of action exist under the Act. *Taussig v. Wellington Fund, Inc.*, 313 F.2d 472, 476 (3d Cir. 1963). The Third Circuit relied on the principle that "breach of a statutory duty

which causes injury to one of the class that the statute serves to protect affords by implication a sufficient basis for a private civil suit by the injured party." *Id*. (citations omitted). Furthermore, the Third Circuit emphasized that in Section 44 of the Act, 15 U.S.C. § 80a-43, Congress created federal district-court jurisdiction "of all suits in equity and actions at law brought to enforce any liability or duty created by, or to enjoin any violation of" the Act. *Id*. Similarly, the First Circuit found an implied private right of action under Section 36 of the Act. *Moses v. Burgin*, 445 F.2d 369, 373 (1st Cir. 1971) ("[T]he Act impliedly authorizes the court to grant civil recovery if their conduct fell within the scope of the phrase 'gross misconduct or gross abuse of trust' contained in section 36 of the Act.") (citations omitted). The First Circuit, like the Third Circuit, relied upon Congress' grant of jurisdiction to "enforce any liability or duty created by the Act" to find an implied private right of action under Section 36. *Id.* (citing *J.I. Case Co. v. Borak*, 377 U.S. 426 (1964)).

The First Circuit and the Third Circuit have reaffirmed their prior holdings that implied rights of action exist under the Act. *Lessler*, 857 F.2d at 873 ("We agree with the Second and Third Circuits that it is consistent with congressional intent and with governing law to imply a private cause of action under the Investment Company Act"); *Bancroft Convertible Fund, Inc. v. Zico Inv. Holdings,*

*Inc.*, 825 F.2d 731,739 (3d Cir. 1987) ("There is an implied private cause of action for enforcement of the Investment Company Act.").

Other Courts of Appeals, however, have rejected implied rights of action under the Act. *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110 (2d Cir. 2007); *Northstar Fin. Advisors, Inc. v. Schwab Invs.*, 615 F.3d 1106 (9th Cir. 2010) (following *Bellikoff*).[17] The Second Circuit's *Bellikoff* decision is surprising in a number of ways. First, the decision is surprising because it does not discuss the prior Second Circuit decisions that recognized implied rights of action under the Act: *e.g.*, *Schwartz v. Eaton*, 264 F.2d 195, 198 n.5 (2d Cir. 1959) (the first Court of Appeals decision to recognize implied rights of action under the Act); *Brown v. Bullock*, 294 F.2d 415 (2d Cir. 1961); *Fogel v. Chestnutt*, 668 F.2d 100 (2d Cir. 1981) (Friendly, J.). It does not mention or acknowledge the Supreme Court's statement in *Transamerica* that "under the Investment Company Act of 1940 which was enacted as companion legislation, Congress expressly authorized private suits for damages in prescribed circumstances." *Cf. Transamerica*, 444 U.S. at 20. Similarly, the Ninth Circuit's *Northstar* decision fails to mention or recognize

---

[17] For a time, the Eighth Circuit held that implied rights of action do not exist under the Act. *Brouk v. Managed Funds, Inc*., 286 F.2d 901 (8th Cir. 1961), dismissed as moot, 369 U.S. 424 (1962). The Eighth Circuit later reversed that interpretation. *Greater Iowa Corp. v. McLendon*, 378 F.2d 783, 793 (8th Cir. 1967).

*Lessler*, *Bancroft*, *Fogel*, *Taussig*, *Levitt*, *Bullock*, *Schwartz, etc.*—the many prior Circuit decisions recognizing an implied private right of action under the Act.

The Pension Funds respectfully submit that the First, Third, and Eighth Circuit decisions, as well as the original Second Circuit decisions, were correct interpretations of Congress' intent in the Act to permit private suits for damages for violations of the Act. Congress' view, if in doubt prior to the Supreme Court's 1979 *Transamerica* decision, should not be in doubt after the 1980 amendments to the Act. In making those amendments, Congress explained its view of implied rights of action under the Act:

> The Congress has long taken the view that private rights of action for violations of the federal securities laws are a necessary adjunct to the Commission's enforcement efforts. With a relatively small staff charged with administrative responsibility for policing potentially unlawful securities-related activities, the Commission cannot be expected to bring actions against even a large portion of those engaged in schemes, devices and activities that are prohibited by federal law. Therefore, private lawsuits serve as an added deterrent to conduct made unlawful by Congress, without the necessity of governmental involvement.
>
> At the same time, and just as important, such lawsuits perform a compensatory function. Violations of these investor protection laws do not simply compromise the integrity of the securities market- place that Congress has found to be so essential to preserving investor confidence in the capital raising efforts of American enterprise. Frauds, manipulations, misrepresentations, self-dealing and other illegal activity cause real and often severe financial injury to investors, both individual and institutional. Private lawsuits, permitting

recovery of damages when properly shown, compensate these victims for the losses they suffer.

The rationale for implying rights of action under the securities laws beyond those actions expressly provided for had been well articulated by the Supreme Court when it observed that implied private rights of actions allowing shareholders to sue to remedy their losses would significantly assist the congressional goal of promoting fair corporate suffrage. But in recent years, the Supreme Court turned its focus toward a strict construction of statutory language and expressed intent.

**The Committee wishes to make plain that it expects the courts to imply private rights of action under this legislation, where the plaintiff falls within the class of person protected by the statutory provision in question.** Such a right would be consistent with and further Congress' intent in enacting that provision, and where such actions would not improperly occupy an area traditionally the concern of state law. In appropriate instances, for example, breaches of fiduciary duty involving personal misconduct should be remedied under Section 36(a) of the Investment Company Act. With respect to the business development companies, the Committee contemplates suits by shareholders as well as by the Commission, since these are the persons the provision is designed to protect, and such private rights of action will assist in carrying out the remedial purposes of Section 36.

H.R. Rep. No. 96-1341, at 28-29 (1980) (emphasis added).

By following *Lessler*, *Bancroft*, *Fogel* and the other decisions finding a private right of action under the Act, this Court would accede to Congress' explicit understanding—made plain at the time that Congress updated the Act in 1980— that implied rights of action exist under the Act. This Court would establish effective legal liability for those individual defendants, as alleged in the Complaint, whose breach of their fiduciary duty of care has resulted in disproportionately large

compensation to BFA and its affiliates. This Court would also establish effective legal liability for those individual defendants who have used their connections to BlackRock to breach their Section 36(a) fiduciary duties in order to benefit their own corporate affiliates, whether by approving exorbitant compensation for BFA or its affiliates, or by improper access to the funds' stocks for short-selling purposes at reduced cost to their affiliates, as alleged in the Complaint. *See* (R. 1, Complaint, 40-41 (¶¶ 200-210)). These are wrongs that, when proven, cannot be remedied under Section 36(b) but that can be remedied if this Court were to recognize Congress' intent to permit implied private rights of action for violations of the Act.

The judgment of the district court dismissing the Pension Funds' Section 36(a) claims should be reversed.

## CONCLUSION

This Court should reverse the district court's dismissal of the Pension Funds' claims under Section 36(b) and 36(a) of the Investment Company Act (Counts I and III of the Complaint) and remand the case to the district court for further proceedings.

Dated: February 13, 2014                    Respectfully submitted,

                                            */s/ James G. Stranch, III*
                                            James G. Stranch, III
                                            J. Gerard Stranch IV
                                            Michael G. Stewart
                                            Michael J. Wall
                                            **BRANSTETTER, STRANCH
                                               & JENNINGS, PLLC**
                                            227 Second Avenue North
                                            Nashville, TN 37201
                                            Tel: (615) 254-8801
                                            jstranch@branstetterlaw.com
                                            gstranch@branstetterlaw.com
                                            mstewart@branstetterlaw.com
                                            mwall@branstetterlaw.com

                                            **ROBBINS ARROYO LLP**
                                            Brian J. Robbins
                                            Craig W. Smith
                                            Jenny L. Dixon
                                            600 B. Street, Suite 1900
                                            San Diego, CA 92101
                                            Tel:  (619) 525-3990
                                            brobbins@robbinsarroyo.com
                                            csmith@robbinsarroyo.com
                                            jdixon@robbinsarroyo.com

                                            **THE PICKRELL LAW GROUP, P.C.**
                                            C. Mark Pickrell
                                            William G. Brown
                                            Andrew E. Hill
                                            5701 Old Harding Pike, Suite 200
                                            Nashville, TN 37205
                                            Tel: (615) 352-9588
                                            mark.pickrell@pickrell-law.net
                                            will.brown@pickrell-law.net
                                            drew.hill@pickrell-law.net

                                            *Attorneys for Appellants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that the foregoing brief was prepared in Microsoft Word with 14-point Times New Roman, a proportionally-spaced typeface.  The brief contains a total of 11,825 words, as calculated by my word processing software, excluding the statements and other materials specified in Fed. R. App. P. 32(a)(7)(B)(iii).

*/s/ James G. Stranch, III*
James G. Stranch, III

## CERTIFICATE OF SERVICE

I hereby certify that on February 13, 2014, a copy of this brief was served on counsel of record for all parties through the Court's CM/ECF system

*/s/ James G. Stranch, III*
James G. Stranch, III

45

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS
### (from Case No. 3:13-cv-00046)

| DESCRIPTION OF ENTRY | DATE | RECORD ENTRY NO. | PAGE ID # RANGE |
|---|---|---|---|
| Verified Complaint | 01/18/2013 | 1 | 1 - 70 |
| BlackRock Defendants' Motion to Dismiss | 03/11/2013 | 21 | 113 - 423 |
| Independent Director-Defendants' Motion to Dismiss | 03/12/2013 | 24 | 426 - 428 |
| Plaintiffs' Response to Motions to Dismiss | 03/28/2013 | 37 | 472 - 607 |
| Memorandum Opinion | 08/28/2013 | 48 | 888 - 907 |
| Order Granting Motions to Dismiss | 08/28/2013 | 49 | 908 - 909 |
| Order of Dismissal with Prejudice | 10/24/2013 | 53 | 919 |
| Entry of Judgment | 10/24/2013 | 54 | 920 |
| Plaintiffs' Notice of Appeal | 11/08/2013 | 55 | 921 - 923 |